IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BRIAN MCNEALY,

                        Plaintiff,

         v.

SAM VAN GALDER, INC.,

                        Defendant.

OPINION AND ORDER

20-cv-40-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Brian McNealy alleges that defendant Sam Van Galder, Inc. terminated him from his job as director of operations because he complained about sex discrimination. He filed this lawsuit under Title VII of the Civil Rights Act, contending that defendant retaliated against him in violation of the Act. Defendant has filed a motion for summary judgment, contending that it fired plaintiff because of his refusal to improve his managerial skills, and not because of any protected conduct. Dkt. #10. I will grant defendant's motion because plaintiff has failed to present evidence from which a reasonable jury could conclude that defendant fired him because of protected conduct.

UNDISPUTED FACTS

From the parties' proposed findings of facts and responses, I find the following facts to be material and undisputed unless otherwise noted.

A.  <u>The Parties</u>

Defendant Sam Van Galder, Inc. is a private transportation company that provides charter bus services throughout Wisconsin.  It is a member of Coach USA, Inc., one of the largest transportation companies in North America.

Plaintiff Brian L. McNealy worked for defendant as director of operations from August 2016 until he was terminated in August 2018.  Plaintiff managed more than 20 employees, and had a variety of managerial duties.  He was supervised by Allen Fugate, a general manager for defendant.  Fugate reported to Mike Pjevach, the vice president, west region, for Coach USA.  Pjevach worked out of corporate offices in New Jersey.

B.  <u>Employee Complaints about Plaintiff</u>

Plaintiff was never disciplined for any misconduct while he worked for defendant, and he received yearly bonuses from defendant.  However, some of plaintiff's employees complained about his managerial style to Fugate, plaintiff's supervisor, and to Miranda Skukan, the human resources generalist working in the same office as plaintiff and Fugate.  On March 11, 2018, Fugate emailed Skukan, stating that he'd had a long talk with plaintiff about various work issues, including that employees were afraid to cross plaintiff, that plaintiff needed "to become more a leader instead of a boss," and that plaintiff needed to "start developing our people and making them <u>better</u> instead of simply building a case to fire them." Dkt. #15-1 at 27 (emphasis in original).  Fugate also told Skukan that plaintiff liked to be feared, that his interactions with employees hurt morale, and that several employees

2

had come to Fugate with concerns about how plaintiff treated them.  Id.  According to Fugate, plaintiff was engaged in a "witch hunt" against one supervisor, who was just one in a long line of employees who had "crossed" plaintiff.  Id.

On April 30, 2018, an employee emailed Skukan with a complaint about plaintiff, accusing him of instigating a conflict between employees.  On June 4, 2018, another employee emailed Skukan, stating that plaintiff had belittled and intimidated him in front of another driver.  Skukan spoke with the driver, who also accused plaintiff of telling other employees about his medical condition.  Another employee told Skukan in July 2018 that she did not trust plaintiff.

Fugate talked with plaintiff on more than one occasion about employee morale, relations with staff and how to improve communication and relationships with employees.


### C.  Sexual Harassment Allegations against Tim Ballenger

Plaintiff supervised an employee named Tim Ballenger, who had worked for defendant for several years.  In August 2017, an employee told plaintiff that Ballenger had made inappropriate comments about a new employee after looking at the new employee's Facebook page.  Plaintiff reported this incident to Fugate, as well as Skukan, the human resources generalist.  Ballenger received a warning letter as a result.

In May 2018, a transgender employee reported to Skukan that Ballenger had stated that he was "going to turn you back."  Skukan reported the incident to plaintiff, and they issued another warning letter to Ballenger.

On July 3, 2018, a customer complained to defendant that when she called defendant's office, Ballenger acted unprofessional and "schmooze[d]" her, which made her uncomfortable to the point that she avoided making contact with the office so she would not have to talk to him.  The customer complaint was forwarded to plaintiff, Fugate and Skukan.  Skukan asked plaintiff how he wanted to handle the complaint.  Plaintiff interpreted Skukan's communication as requesting him to handle the situation.  Plaintiff then asked Skukan to provide him with all relevant documents relating to sexual harassment allegations against Ballenger.  Sukan forwarded Ballenger's previous two warnings to plaintiff.  Plaintiff then asked two individual employees who had complained to him about Ballenger to provide written statements about their interactions with him.

A 17-year old intern sent an email to plaintiff listing the inappropriate comments that Ballenger had allegedly spoken to her, including that she was "young, cute, and nice," and that, "If [he] could, [he] would say 'Damn girl you look hot.'"  Another employee wrote to plaintiff that Ballenger had once encouraged her to use to her "womanly ways" to "sweet talk" the drivers.  She also stated that Ballenger compared her to a former employee of defendant who was able to "sweet talk" drivers to "get them to do anything."  The employee stated that Ballenger's comments made her uncomfortable, that Ballenger continued talking inappropriately for ten minutes despite receiving no reaction from her, and that Ballenger failed to relay important work information as a result.  The employee stated that Fugate was present during the incident and blamed her for a resulting work problem.

After receiving the written complaints, plaintiff called Michele Hartigan, the corporate

4

human resources manager for Coach USA. (Hartigan worked at corporate offices in New Jersey.) Plaintiff told Hartigan that Ballenger had engaged in workplace sexual harassment, and that Ballenger had been warned twice about sexual harassment in the past. Based on the conversation with plaintiff, Hartigan supported termination of Ballenger. (Plaintiff says that Hartigan instructed him to terminate Ballenger when Ballenger returned from vacation. But Hartigan denies this, stating that she did not have the authority to direct plaintiff to terminate Ballenger, and that she did not direct or ask plaintiff to move forward with terminating Ballenger.)

On July 16, 2018, plaintiff went to Fugate's office and asked him whether he was aware of what was happening with Ballenger. Plaintiff told Fugate that there had been allegations of sexual harassment against Ballenger, and that plaintiff and Hartigan supported termination. (According to plaintiff, Fugate responded by saying, "yeah, he slipped again." Fugate denies saying this.) Fugate asked plaintiff what he was doing to develop and coach Ballenger. He also asked plaintiff whether Ballenger could be transferred to a driver position, so he could be retained as an employee. Plaintiff stated that he did not want to make Ballenger a driver because that would create a hostile work environment for others and would expose the company to liability.

Fugate then took out an employee roster and began discussing other employees with plaintiff. Fugate identified one employee who he thought would resign if Ballenger were terminated. Fugate also identified employees with attendance issues, including one of the employees who had accused Ballenger of making inappropriate comments to her. (There is

no evidence suggesting that Fugate knew at the time that the employee had made the accusation against Ballenger.)   Fugate asked plaintiff how he intended to address the problems with other employees.  Plaintiff interpreted Fugate's statements as an attempt to intimidate plaintiff because of plaintiff's desire to terminate Ballenger.  (Plaintiff alleges that Fugate and Ballenger were close friends, but he has submitted no evidence to support this assertion.)

On July 18, 2018, plaintiff forwarded the documentation that he had gathered about Ballenger to Hartigan.  Plaintiff also told Hartigan about the conversation he had with Fugate two days before.  He texted Hartigan stating:

> [Fugate] appears now to understand that I am terminating [Ballenger]. He is now concerned that when [Ballenger] is terminated, [another employee] is going to quit. He claims she is disenged. He passively blames me . . . Fugate is basically trying to deter me from terminating [Ballenger].

Hartigan responded, "Well there is not much you can do about it now since [Ballenger] is still on vacation, so let me wait to hear back from Mike [Pjevach] and I will circle back."

Hartigan reviewed the information that plaintiff had sent, including the prior warnings that Ballenger had received from Skukan and plaintiff.  Hartigan noted that no details about Ballenger's prior infractions were recorded on the written warnings.  Hartigan contacted Skukan, who told Hartigan that plaintiff had not counseled Ballenger properly at the time the previous warnings were issued.  Skukan reported that plaintiff had presented disciplinary documents to Ballenger to sign, but that plaintiff did not explain the violation to Ballenger or give him any opportunity to understand how to correct his behavior. (Plaintiff denies that he failed to counsel Ballenger adequately.  However, he has presented

no evidence to dispute what Skukan told Hartigan.)  Hartigan also spoke with Fugate about Ballenger and plaintiff.

Hartigan concluded that Ballenger should be counseled about his behavior and the harassment allegations before being terminated.  She determined that instead of termination, Ballenger should be issued a final warning and one last chance to improve, in an effort to help him succeed.  Hartigan spoke with Pjevach, the vice president, west region, for Coach USA.  Pjevach agreed that Ballenger should receive one more chance.

On July 23, plaintiff texted Hartigan asking, "I know you are busy, but do you still want me to terminate [Ballenger] today?"  Hartigan responded, "We need more time. I will get back to you tomorrow."

The next day, Hartigan spoke with Ballenger about the complaints against him. Plaintiff and Skukan were also present.  Hartigan talked about appropriate work behavior, proper language and how Ballenger should act in various scenarios.  Ballenger stated that he did not realize that his behavior made people feel uncomfortable, and he acknowledged at the end of the meeting that he understood what he had done wrong.  Hartigan gave Ballenger a last chance agreement.

### D.  Hartigan and Pjevach Counsel Plaintiff

Plaintiff thought that Ballenger should have been terminated, and he thought that Hartigan should have addressed Fugate's behavior toward plaintiff.  Plaintiff decided to contact Linda Burtwistle, the chief operating officer of Coach, USA.  Plaintiff sent Burtwhile

a 16-page letter on July 23, 2018, describing "the work environment at Van Galder."  Dkt. #23-12.  Plaintiff wrote about the handling of the Ballenger situation, as well as his criticisms of how several other employees, including Fugate, behaved.

Burtwistle responded to plaintiff that she was going to ask Hartigan to investigate plaintiff's allegations.  Burtwistle then forwarded plaintiff's report to Hartigan and directed her to investigate plaintiff's report, stating "Lots of points to investigate but particularly concerned about comment [Fugate] has allegedly made toward the end of the document." Dkt. #24-2.  Near the end of plaintiff's report, plaintiff alleged that Fugate had asked an employee who had blue chemicals on his hands if he was "feeling-up a smurf?"  Hartigan responded to Burtwistle that she and Pjevach were traveling to Wisconsin to talk to Fugate and plaintiff.  Hartigan stated that she would address the alleged comments that Fugate made.  As for plaintiff, she stated that Skukan had contacted her to complain about plaintiff's management style and about his trouble building relationships with employees. Hartigan told Burtwistle that plaintiff seemed paranoid, upset and "unhinged" in her own conversations with him, and that she and Pjevach wanted to help him "be more successful in his role." Dkt. #24-1.  Burwistle responded that she was happy with Hartigan's approach.

Hartigan and Pjevach made plans to travel to Madison in August.  On August 5, Fugate sent an email to Pjevach setting forth a list of performance problems and deficiencies that he had observed in plaintiff, including that plaintiff had failed to enact a plan for employees to complete required training, that plaintiff continued to pit employees against each other, that employees did not trust plaintiff, that plaintiff was paranoid that people

were trying to get him fired, and that plaintiff blew off suggestions for improvement from Fugate or Skukan.  Dkt. #24-11.

On August 6, 2018, Hartigan emailed plaintiff ,stating, "There are a few things I want to touch base on, specifically Tim Ballenger."  On August 8, 2018, Pjevach and Hartigan traveled to Wisconsin to meet with plaintiff.

Before talking with plaintiff, Pjevach and Hartigan met with Skukan to discuss plaintiff's management style.  Skukan described plaintiff as a bully who pitted employees against one another.  She also stated that he spent most of his time in his office, that employees did not trust him, that he demanded instead of asked for things, and that if someone got on his bad side, he would attempt to get the person fired.  (Plaintiff disputes Skukan's description of him, but does not dispute that she reported these things to Hartigan and Pjevach.)

Pjevach and Hartigan also met with Fugate.  They talked to him about the comment that Futage had allegedly made (the smurf comment), and told him that the comment was inappropriate.  Pjevach and Hartigan also talked to him about how things were going with plaintiff, and Fugate shared the same concerns he had shared with Pjevach previously.

Hartigan and Pjevach then met with plaintiff.  Hartigan explained to plaintiff why she did not terminate Ballenger.  She wanted plaintiff to understand her reasoning and the variables she considered in making the decision.  Hartigan then started discussing plaintiff's management style and his relationship with office staff.  She wanted to coach him on ways that he could improve as a manager, and she provided specific examples of plaintiff's actions.

Hartigan questioned plaintiff's investigations of employees and the one-on-one meetings that plaintiff had with staff in which he questioned them about their coworkers.   Hartigan suggested that plaintiff could try a different approach to building relationships and morale, such as group round-table meetings, but plaintiff rejected the idea.

Hartigan also discussed an incident involving an employee who threatened to resign unless she received a raise.   Plaintiff accepted the employee's resignation and quickly placed a listing for her position on Indeed.com.   The employee then rescinded her resignation, which plaintiff accepted, but did not remove the posting for her position.   Hartigan thought that leaving the posting up could hurt the morale of the employee, and questioned plaintiff about his action.   Plaintiff was defensive.   He began criticizing Fugate, and stated that Fugate did not support him and dealt poorly with employee concerns.   Plaintiff stated that he suspected Fugate was trying to replace him and regularly checked to see if his job had been posted online.   Plaintiff repeatedly asked why Hartigan and Pjevach were questioning him, and stated that they should be investigating Ballenger, not him.   Hartigan  and Pjevach explained to plaintiff that  he  was  not  under investigation, but rather, they were trying to provide him ways to be more successful in his role.   Plaintiff did not believe them and thought that their questions were investigative.

### E.  Plaintiff's Employment is Terminated

The day after the meeting, plaintiff sent a five-page letter to COO Burtwistle, describing the conversation he'd had with Hartigan and Pjevach.  Dkt. #23-14.  Plaintiff

10

stated that he was being investigated and that Hartigan did not investigate his July 23 report. Dkt. #23-14. Burtwistle forwarded the letter to Hartigan and Pjevach. Hartigan was surprised by plaintiff's letter to Burtwistle, and concerned that plaintiff was defensive and resistant to her counseling. However, she and Pjevach wanted to give plaintiff an opportunity to consider the discussion and change his conduct. They hoped that plaintiff would reach out to them after he had taken time to reflect on their conversation.

However, plaintiff made no changes to his behavior and, instead became very distant and cut off his interactions and relationships with, among others, Hartigan and Fugate. Plaintiff would typically call Hartigan at least once or twice a week to discuss various issues previously, but that practice ceased after the August 8 meeting. Hartigan attempted multiple times to reach out to plaintiff after the meeting, but plaintiff never returned her calls or messages.

On August 16, 2018, an employee emailed Skukan with complaints, including saying that plaintiff was bullying him. Skukan forwarded the email to Hartigan on August 17, and stated that plaintiff had asked her repeatedly about the email and had told her that he was going to write up the employee for insubordination and that she needed to do something about it. On August 17, 2018, Skukan also forwarded Hartigan an email that an employee had sent her, complaining about plaintiff instigating conflict between employees. Skukan characterized the email as an "example of how [plaintiff] pins employees against each other." Dkt. #24-4.

Hartigan and Pjevach talked with Fugate and decided that plaintiff should be

terminated.  Plaintiff's employment was terminated on August 22, 2018.


OPINION

Plaintiff contends that defendant terminated his employment in retaliation for complaints he made about sexual harassment.  Title VII forbids retaliation by employers against employees who "oppose" workplace discrimination.  42 U.S.C. § 2000e-3.  To survive summary judgment on a claim of unlawful retaliation under Title VII, plaintiff must produce enough evidence for a reasonable jury to conclude that (1) he engaged in a statutorily protected activity; (2) defendant took a materially adverse action against him; and (3) there existed a but-for causal connection between the two.  Burton v. Bd. of Regents, 851 F.3d 690, 695 (7th Cir. 2017); Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty., 804 F.3d 826, 833 (7th Cir. 2015).

Plaintiff's theory is that Allen Fugate, his supervisor, was angry that plaintiff reported Tim Ballenger's sexual harassment.  According to plaintiff, Fugate did not want plaintiff to fire Ballenger, so plaintiff manipulated Michele Hartigan and Mike Pjevach into terminating plaintiff by presenting them false statements about plaintiff's performance as a manager.  Ultimately, plaintiff's claim fails because he has not submitted evidence to satisfy the third element of his claim: he has presented no evidence showing that he was fired because of his reports about sexual harassment.

Instead, the evidence shows that plaintiff was terminated because numerous employees had complained about his behavior, and plaintiff showed an unwillingness to

12

work on or correct his deficiencies.  Miranda Skukan, the human resources employee who worked most closely with plaintiff, reported to corporate representatives Michele Hartigan and Mike Pjevach that plaintiff was a bully who was not good for employee morale.  Skukan described negative interactions that she'd had with plaintiff, and she passed on several complaints that she had received about plaintiff from other employees.  There is no evidence that Skukan's communications were motivated in any way by plaintiff's reports of sexual harassment.

The evidence also shows that Hartigan and Pjevach met with plaintiff in an attempt to coach him on effective management, but that plaintiff responded by being defensive and questioning their motives.  Instead of working on his management skills, plaintiff cut off contact with Hartigan and sent long letters to the chief operating officer of Coach USA, criticizing numerous fellow employees and displaying paranoia about the motives of his coworkers.  Hartigan and Pjevach were disappointed in plaintiff's actions and his  refusal to work on his management skills and therefore terminated him.  On the basis this evidence, no reasonable jury could conclude that plaintiff was fired in retaliation for his complaints about sexual harassment.

Plaintiff makes several arguments in response, but none is persuasive.  First, he argues that Fugate's response to the sexual harassment allegations against Ballenger show that Fugate acted with a retaliatory motive.  He says that Fugate was a close friend of Ballenger and was angry that plaintiff wanted to fire Ballenger, so Fugate starting accusing other employees of having performance problems.  But plaintiff has presented no evidence that

13

Fugate and Ballenger were close friends or that Fugate was upset that plaintiff had reported Ballenger's sexual harassment.  Nor has he presented evidence that Fugate manufactured performance problems about other employees in retaliation for plaintiff's report.  Indeed, there is no evidence that either Fugate or any other member of management attempted to discipline the other employees who reported Ballenger's behavior.

The evidence instead shows that Fugate was not upset that plaintiff reported Ballenger, but that Fugate was frustrated by plaintiff's management style generally, his refusal to coach employees, and his failure to engage employees in a positive way.  Defendant submitted evidence showing that Fugate's frustration started months before plaintiff proposed to terminate Ballenger, and that Fugate had talked to plaintiff about his management style as early as March 2018.

Plaintiff contends that if Fugate, Pjevach and Hartigan genuinely thought he was performing poorly, plaintiff would have received discipline and would not have been eligible for annual bonuses.  Plaintiff argues that he was an effective manager and that it was actually Fugate and others that caused problems in the office.  However, defendant presented evidence that bonuses are awarded based on specific metrics set by the company, connected primarily to company success.  In addition, the fact that plaintiff had not been formally disciplined does not mean that defendant was satisfied with his performance.  See, e.g., Abrego v. Wilkie, 907 F.3d 1004, 1013 (7th Cir. 2018) (plaintiff's "fully successful" performance reviews not sufficient to defeat summary judgment on discrimination claim); Zayas v. Rockford Memorial Hospital, 740 F.3d 1154, 1158 (7th Cir. 2014) (courts do not

"merely consider whether a plaintiff's actual job performance was satisfactory"; rather, we must also contemplate "factors such as insubordination and workplace camaraderie"). The evidence here shows that defendant was not satisfied with plaintiff's performance, and that defendant's concerns intensified after Hartigan and Pjevach met with plaintiff in person.

In sum, the evidence shows that defendant terminated plaintiff's employment for legitimate and non-retaliatory reasons, unrelated to any reports he made about sexual harassment in the workplace. Accordingly, defendant is entitled to summary judgment.


ORDER

IT IS ORDERED that defendant Sam Van Galder's motion for summary judgment, dkt. #10, is GRANTED. The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 6th day of April, 2021.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge

15